**In re COMPETROL ACQUISITION PARTNERSHIP, L.P., et al., Debtors.**

**Nos. 94–622 to 94–626(PJW).**

United States Bankruptcy Court, D. Delaware.

Aug. 2, 2000.

Teresa K.D. Currier, Adam G. Landis, Klett Rooney Lieber & Schorling, Wilmington, DE, Michael N. Sheetz, Charles A. Dale, III, Gadsby & Hannah LLP, Boston, MA, for Boston Redevelopment Authority.

James L. Patton, Jr., S. David Peress, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, for Martin Oliner, Plan Administrator.

## MEMORANDUM OPINION

PETER J. WALSH, Chief Judge.

Before the Court is the motion (the "Motion") (Doc. # 295) of the debtors' (the "Debtors") Chapter 11 plan administrator (the "Plan Administrator") for a determination of the cure amount in connection with the assumption and assignment of a land disposition agreement (the "LDA")

between Debtors and the Boston Redevelopment Authority (the "BRA"). The Plan Administrator argues that Debtors have no obligation to pay cure amounts to the BRA pursuant to the LDA because the BRA failed to satisfy certain conditions (the "First Milestone" and "Second Milestone") imposed by the LDA which conditions are prerequisites to payment obligations. For the reasons set forth below, the Plan Administrator's Motion seeking an order determining that the cure amount owed to the BRA is "zero" will be denied to the extent I find payment is owed to the BRA for satisfaction of the First Milestone but granted to the extent I find payment is not owed the BRA because of BRA's failure to satisfy the Second Milestone.

## FACTS

On January 26, 1996, the Second Amended Chapter 11 Plan (the "Plan") of affiliates Competrol Acquisition Partnership, L.P. ("Competrol"), Charlestown Holdings, Inc. ("CHI"), and Imobilaire New England ("INE")(together, the "Debtors") was confirmed. As set forth in the Plan, funding for transactions contemplated by and distributions under the Plan are to be provided by an entity known as LDA Acquisition LLC ("LDA Acquisition") as consideration for the Debtors' assignment of the LDA to LDA Acquisition. Before confirmation of the Plan, a dispute arose as to the amount of cure payments owed to the BRA by Debtors for the proposed assignment of the LDA pursuant to § 365 of the Bankruptcy Code.[1] Unable to reach a settlement of their dispute with the BRA, Debtors' Plan provided for the following treatment of any claim resulting from the assignment of the LDA:

> The assumption of the LDA and the assignment of the LDA to LDA Acquisition ... on the Effective Date is hereby approved; provided that the Court shall determine, upon application by the parties, the amount payable to the BRA in accordance with Section 365(b)(1) of the Bankruptcy Code.

Order Confirming the Second Amended Plan of Liquidation, at ¶ 33 (Doc. # 224). After confirmation of the Plan, the parties attempted to reach an agreement as to the amount owed, if any, to the BRA by Debtors. No agreement was reached and the Plan Administrator's Motion was filed.

The Plan Administrator contends that the cure amount owed the BRA by Debtors is "zero" because essential conditions to payment under the LDA, the so-called First and Second Milestones, were not satisfied by the BRA. The BRA asserts that all conditions and obligations triggering payment by Debtors were met prepetition and the appropriate cure amount on account of pre— and postpetition defaults under the LDA is $7,809,200 plus interest and attorneys' fees.[2] Hearings were held

---

1. Section 365 provides in relevant part:

   (a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.
   (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee-

   (A) cures, or provides adequate assurance that the trustee will promptly cure, such default ...
   11 U.S.C. § 365.

2. The BRA also advances arguments based on theories of estoppel, waiver, and substantial performance. The BRA claims that INE's failure to timely and sufficiently voice its concerns about the BRA's alleged failure to meet is obligations pursuant to the LDA somehow conclusively and legally demonstrates that the BRA satisfied those obligations. Alternatively, the BRA suggests that even if it did not

over three days on July 24 and November 4 and 5, 1998 and both parties submitted pre-trial and post-trial memoranda.

In 1978, INE and the BRA entered into a land disposition agreement (the "First LDA") pursuant to which INE was granted exclusive rights to acquire and develop certain portions of the former Charlestown Navy Yard in Boston, Massachusetts (the "Navy Yard"). *See* Transcripts, p. 156:8–16 (hereinafter "Trans. at ___"); Ex. 4. The BRA is a corporation organized and created by an act of the Massachusetts General Court, charged with overseeing urban renewal projects in Boston, Massachusetts, and with overseeing the planning of development projects requiring permitting or zoning relief in the city. *See* Trans. at 24:3–22; 152:14–21. One such project was the development of the Navy Yard which had been deeded to the BRA by the United States Department of the Navy in or about 1976. The BRA had been placed in charge of the development of this waterfront property and INE was originally designated as the exclusive developer of a large portion of the Navy Yard. INE was granted a mortgage over most of the remaining undeveloped portion of the Navy Yard to secure the obligations of the BRA to INE.

Pursuant to the First LDA, development of the Navy Yard was to take place on several designated parcels, numbered 1 through 7.[3] Parcels 4 (also known as Parcel B), 5 (also known as Parcel E), 6 and 7 (also known as Parcel A) together constitute the Yard's End ("Yard's End") portion of the Navy Yard. The planned development of the Yard's End area is the subject of the dispute *sub judice*.

Between 1978 and 1990, under the auspices of the BRA, INE successfully developed several projects at the Navy Yard, including construction of several condominium projects, construction of a large marina, rehabilitation of certain buildings located at the Navy Yard, and construction of a medical research center for a large area hospital. *See* Trans. at 212:16–214:2.

In 1990, the BRA sought to amend the First LDA because it wished to free Parcel 5 from INE's control so that the New England Aquarium (the "Aquarium") could relocate to the Navy Yard from its existing location on Boston's Central Wharf. Because the relocated Aquarium would serve as a public use facility, relocation of the Aquarium to the Navy Yard was important to the proposed development plan at the Navy Yard in order that the BRA might meet its mandate of balancing private and public use development at the Navy Yard. *See* Trans. at 76:10–78:8. Accordingly, INE ceded its rights in Parcel 5 to the BRA, subject to re-vesting should the Aquarium fail to relocate to Parcel 5 and the LDA as amended, was executed in

---

perform completely, it performed sufficiently to trigger INE's payment obligations. Because I find that the BRA failed to meet a significant part of its contractual obligations and the LDA provides a mechanism for payment in satisfaction of partial performance, I will not address these arguments in reaching my decision.

**3.** The various Parcels at issue are referred alternately by letter or number. The following is a list of the interchangeable Parcel names and the proposed development for each Parcel:

Parcel A is also referred to as Parcels 6 and 7: biomedical research and/or office space;
Parcel B is also referred to as Parcel 4: hotel or residential housing;
Parcel C is also referred to as Pier 5: 110 market rate residential units;
Parcel D is also referred to as Pier 9 and a portion of Parcel 4B: 150–slip marina;
Parcel E is also referred to as Parcel 5: New England Aquarium, later the Whydah Project.

December 1990, effective retroactively to September 28, 1990. *See* Trans. at 161:6–10; 161:19–22; Ex. 4. Ultimately, faced with problems associated with the troubled real estate climate then existing in Boston, the Aquarium did not relocate to the Navy Yard.

The LDA set forth the planned development program for Parcels 4, 6, and 7. *See* Ex. 4 at § 101(31). The LDA had an initial term of 14 years that could be extended up to 36 months for each parcel provided there was ongoing construction on that parcel as of September 28, 2004. *See id.* at § 104(64). The LDA provides for the sale and redevelopment of the Navy Yard on a parcel by parcel basis, setting forth the purchase price per parcel in § 203. *See id.* at § 203. According to the terms of the LDA, INE was required to make an initial payment of $1,500,000 to the BRA toward the purchase of Parcel A on or before December 21, 1990; that $1,500,000 payment was timely made. *See* Ex. 4. The balance of the total $9,840,000 purchase price for Parcel A was to become payable only after the BRA had satisfied the First and Second Milestones pursuant to the LDA. *See id.*

The conditions of the two milestones that the BRA was obligated to meet before INE would be required to tender the purchase price included securing zoning amendments, environmental impact approvals, and amendments to both the applicable urban renewal plan (the "Charlestown Urban Renewal Plan") and the applicable historic design guidelines (the "Historic Design Guidelines"). *See id.* Achievement of these regulatory changes and agency approvals was required to facilitate INE's proposed plan of development at Yard's End. *See id.* INE proposed a two-phase development of the Yard's End parcels (the "Development Program"). Phase one of the De-

velopment Program included development of a 150–slip marina at Pier 9, a 400–room hotel on Parcel 4, and the first of three buildings on Parcels 6 and 7, all scheduled for completion by 1995. *See* Trans. at 169:13–23; 418:21–420:9. Phase two of the Development Program, scheduled for completion by the year 2000, contemplated construction of the remaining two buildings of the Research Center on Parcels 6 and 7. *See* Trans. at 419:14–420:9. Although, at the time the LDA was executed, the parties believed the Aquarium would relocate to Parcel 5 at the Navy Yard, the parties agreed that INE's development at Yard's End pursuant to the LDA was not conditioned on the Aquarium's relocation to Parcel 5. *See* Trans. at 193:14–194:23; Ex. 26; Ex. 4 at Exhibit B.

According to the LDA, the First Milestone required that the BRA meet five distinct conditions, providing that Debtors' payment obligation arose when:

all of the following conditions have been met and *shall continue to remain satisfied:*

1. The Waiver Condition (as hereinafter defined) shall have been satisfied;

2. The Notice of Project Change shall have been filed as required in Subsection 208A(b) hereof and, with respect to Building 1 on Parcel A and with respect to Parcels B, C, and D, [the Massachusetts Executive Office of Environmental Affairs] EOEA shall have determined that the change does not significantly increase the environmental consequences or warrant resubmission of an [Environmental Notification Form] ENF, rescoping, supplementary documentation or a further [Environmental Impact Report] EIR, and that no further review is required under [the Massachusetts

Environmental Policy Act] MEPA; all applicable appeal periods with respect to such determination by EOEA shall have expired without the filing of an appeal or notice of intent to appeal or in the event an appeal is filed, the outcome of such appeal has been finally and favorably determined; no further notice of project change shall be pending or have been made; and such determination shall not have lapsed or been revoked or modified.

3. The Amendment to [the Historic Design Guidelines] as defined in Subsection 208A(f) hereof shall have been executed by the [BRA] and the Massachusetts Historical Commission and shall have been approved (*or, to the satisfaction of [Debtors], been deemed approved*) by the Advisory Council on Historic Preservation, no change to the Amendment to [the Historic Design Guidelines] which is not permitted under Subsection 208A(f) hereof shall be pending or have been made, and the Amendment to [the Historic Design Guidelines] shall not have been revoked and shall be in full force and effect;

4. The [Charlestown Urban Renewal Plan] shall have been amended to the extent determined necessary by the [BRA]'s counsel to allow all of the [Debtors'] Programs to be constructed on an as-of-right basis, all applicable appeal periods with respect to such amendment shall have expired without the filing or threat of an appeal and no further change, modification or amendment shall be made without the prior written consent of the [Debtors]; and

5. The amendments to the Boston Zoning Code described in Section 208A pertaining to the Boston Zoning Code shall have been adopted by the Boston Zoning Commission, all appli-

cable appeal periods with respect to such amendment shall have expired without the filing or threat of an appeal and no further change, modification or amendment to the Boston Zoning Code shall be pending or have been made, except as permitted by Subsection 208A(j).

Ex. 4, LDA at § 101(35)(Emphasis added).

The LDA describes the Second Milestone as follows:

"Second Milestone" shall mean with respect to Parcels A, B, C, and D, that a Certificate has been issued by the Secretary of the EOEA, *which certificate approves a Final Environmental Impact Report [FEIR] for all portions of the Development Programs without requiring further notice or study under MEPA* (such certificate to be issued upon the determination of EOEA that no further notice or study is required, or if further action is required by EOEA in response to the Notice of Project Change, upon completion of such action as required by EOEA), and that (1) all applicable appeals periods with respect to such Certificate have expired without the filing of any appeal; (2) in the event an appeal is filed, the outcome if such appeal has been finally and favorably determined; and (3) the Certificate issued by the Secretary of the EOEA shall not have lapsed or have been revoked or modified.

Ex. 4, LDA at § 101(62)(Emphasis added).

The LDA also sets forth Debtors' proposal for development of the Yard's End parcels. Exhibit B to the LDA provides:

[Debtors] shall have the exclusive right to develop the Parcels subject to this Agreement in accordance with the Development Programs described below:

*Parcel A:* 1,100,000 square feet of space, together with the right to construct up

to 1200 structured parking spaces and the obligation to construct structured parking spaces equal to .9 per 1,000 square feet of development. Of the 1,100,000 square feet of space, at least 600,000 square feet of space (the "Research Component") shall be designed and constructed for research center (with accessory office) use ("Research Use"), and 500,000 square feet of space (the "Office/Research Component") shall, at [Debtors'] option, be designed and constructed either for primary office use or for Research Use, or for any combination of the two. Both Components may be used for Research Use; the Office/Research Component may be used for office use, and the Research Component may be used for office use (provided that it has been designed for Research Use, as set forth above), if and to the extent that, in [Debtors'] judgment, there is no readily available leasing market for Research Use. The Components, or portions thereof, may be brought on line in such sequence as [Debtors determine].

*Parcel B:* A 400 room hotel/conference center together with the right to construct up to 300 structured parking spaces and the obligation to construct at least 175 structured parking spaces....

If the Aquarium development Condition is not met, [Debtors] may, at [their] option, either (i) develop Parcel B as described in the immediately preceding paragraph, or (ii) develop Parcel B with at least 180 and no more that 334 market rate residential condominium/apartment units ...

*Parcel C:* ... 110 Market rate residential condominium/apartment units ... together with the right and obligation to develop structured parking spaces

per unit required to satisfy market demands ...

*Parcel D:* ... a private marina containing, at [Debtors'] option, up to 150 marina slips, together with accessory marina uses which may be constructed on the remaining portion of [Parcel D]....

*Parcel E:* If the Aquarium Development Condition is not satisfied, [Debtors] shall have the exclusive right to develop on Parcel E 275,000 gross square feet of area for commercial use, together with such additional square footage as may be devoted to facilities of public accommodation ...

Ex. 4, LDA at Exhibit B.

In a separate letter agreement executed on December 21, 1990 (the "Letter Agreement") the parties addressed the possible impact on the terms and obligations of the LDA if there arose problems associated with the anticipated relocation of the Aquarium to Pier 5 on Parcel E. The Letter Agreement provides:

It is understood that the BRA will cooperate with [Debtors], as provided in the [LDA], in obtaining all applicable permits and approvals for the development plan described in the [LDA]. However, it is acknowledged and agreed that if, despite the good faith efforts of the parties, the third party approvals, necessary for either the First Milestone or Second Milestone, are denied or unreasonably delayed solely due to Pier 5 related issues, all First and Second Milestone related payments will be due when the development program, minus Pier 5, receives the applicable permits and approvals as provided in the [LDA], and all other conditions to those payments being due are satisfied.

Ex. 5, Letter Agreement.

As provided in the LDA, payments due and owing upon the BRA's satisfaction of

the First and Second Milestones are independent financial obligations. *See* Ex. 4, LDA at Art. II, § 203(a). That is, while payment for completion of the Second Milestone arises only after it is determined that the Second Milestone has been met, certain payments due for satisfaction of the First Milestone are not conditioned on the subsequent satisfaction of the Second Milestone. *See id.*

The parties agreed that, should the First Milestone be timely satisfied, Debtors would incur the following payment obligations to the BRA:

1. $400,000 immediately upon achievement of the First Milestone;
2. $1,588,000 on or before September 28,1991; and
3. $1,588,000 on September 28 of each successive year for four years.

Ex. 4, LDA at Art. II, § 203(a)(1)-(5). However, should the First Milestone not be achieved by September 28, 1991, or should a condition of satisfaction cease to exist after having been met, any payment due for Building 1 on Parcel A would be deferred pending satisfaction of the First Milestone. *See id.* at (5)(i). Similarly, any payments due for Buildings 2 and 3 on Parcel A would be deferred until both the First and Second Milestones had been achieved should either or both remain unsatisfied by September 28, 1991 or lapse at some time thereafter. *See id.* at (5)(ii). Further, prior to accomplishment of the Second Milestone, the BRA was only entitled to receive that portion of the prescribed $1,588,000 annual payments represented by the total number of square feet approved for Building 1 on Parcel A (296,000)divided by the total number of square feet proposed for Buildings 1, 2, and 3 on Parcel A (1,100,000). *See id.*

On September 30, 1991, in accordance with the § 203(a) of the LDA, for the BRA's asserted satisfaction of the First Milestone the BRA issued separate invoices to INE of $400,000 and $427,316 for the prorated Building 1 payment component that came due on September 28, 1991. *See id.* Ex. 17; Ex. 4. The BRA maintains that $2,748,684 also came due on September 28, 1992 comprised of the balance of the initial First Milestone payment ($1,160,684) and the second annual installment of $1,588,000. The BRA further contends that subsequent annual installments of $1,588,000 came due pursuant to the LDA on September 28 of 1993, 1994, and 1995. Apparently no invoices were issued for these subsequent payments, although billing is not required under the LDA in order to trigger INE's payment obligations. *See* Trans. at 345:14–15.

INE did not initially make payment in response to the BRA's invoices of September 30, 1991. On September 4, 1992, the BRA made a demand upon INE for the payment billed on September 30, 1991. *See* Ex. 30. Although INE maintained that it "did not necessarily agree that the sums demanded [were] due," ultimately, when confronted with the BRA's indication that it might take steps to de-designate INE as developer under the LDA, INE submitted a payment of $82,700 to the BRA. *See* Ex. 39. On January 7, 1993, the BRA tolled a notice of default to INE for the latter's failure to fully satisfy its obligations under the LDA. On July 21, 1993, September 22, 1993, and November 8, 1993, INE submitted additional payments to the BRA each in the amount of $82,700, on each occasion reserving its right to object to the validity of the default notice. *See* Trans. 363:9–24; 364:1–10; 370:14–20; 371:18–21; Ex 49; Ex. 50. On June 24, 1994, INE made an additional payment of $200,000 to the BRA with the same reservation of rights. *See* Trans. at 373:22–24; 374:1–7; Ex. 54.

## DISCUSSION

The Plan Administrator contends that the BRA failed to satisfy the First and Second Milestones pursuant to the LDA and Debtors are not obligated to make any cure payments upon the assumption and assignment of the LDA. Achievement of the First Milestone required initial and continuing satisfaction of five elements: (1) the Waiver Condition; (2) the Notice of Project Change; (3) amendment to the Historic Design Guidelines to allow Debtors to complete construction on an as-of-right basis; (4) amendment of the Charlestown Urban Renewal Plan to allow Debtors to complete construction on an as-of-right basis; and (5) adoption of amendments to the Boston Zoning Code to allow Debtors to complete construction on an as-of-right basis. If it is determined that the BRA met, and continued to satisfy, each of these five requirements, payment for the First Milestone would be due pursuant to the LDA as cure payment under § 365 of the Bankruptcy Code.

▮ Debtors base their contention that the First Milestone was not satisfied on two perceived failings by the BRA: (i) failure of the BRA to satisfactorily meet the Notice of Project Change condition and (ii) failure of the BRA to amend the Historic Design Guidelines so that INE could complete its Development Program on an as-of-right basis. In relevant part, the Notice of Project Change [4] condition requires determination by the EOEA or the Secretary of Environmental Affairs (the "Secretary") with respect to Building 1 on Parcel A and the proposed development of Parcel B that the contemplated Development Program projects "do not significantly increase the environmental consequences or warrant submission of an ENF, rescoping, supplementary documentation or an EIR and that no further review is required under the MEPA." *See* Ex. 4 at § 101(35)(2). Debtors contend that, after consideration of the Notice of Project Change, the EOEA required further MEPA study for a portion of the Development Program and therefore, the First Milestone was not met.

Specifically, Debtors charge that, although the BRA did submit a Notice of Project Change to the EOEA on October 31, 1990, the Notice of Project Change as submitted did not seek approval for the construction of residential housing on Parcel 4 (Parcel B) in the event the Aquarium did not relocate to the site on Parcel 5. The Notice of Project Change only sought approval for development of a hotel on Parcel 4. However, the LDA contemplates two scenarios for Parcel 4: if the Aquarium were to relocate to Parcel 5, INE would be restricted to building a hotel on Parcel 4. If the Aquarium were not to relocate to Parcel 5, INE could build either a hotel or residential housing on Parcel 4. Debtors contend that, because residential use was not approved for Parcel 4 under the MEPA pursuant to the Notice of Project Change, the BRA did not meet a

---

**4.** The Notice of Project Change was to be drafted according to the Code of Massachusetts Regulations Title 301 C.M.R. 11.00 which provides:

> 301 C.M.R. 11.00 *et seq.* is promulgated to create a uniform system for compliance with the Massachusetts Environmental Policy Act, M.G.L. c. 30, § 61 through 62H, inclusive (MEPA). The purpose of MEPA and 301 C.M.R. 11.00 is to provide meaningful opportunities for public review of the potential environmental impacts of Projects for which Agency Action is required, and to assist each Agency in using (in addition to applying any other applicable statutory and regulatory standards and requirements) all feasible means to avoid Damage to the Environment or, to the extent Damage to the Environment cannot be avoided, to minimize and mitigate Damage to the Environment to the maximum extent practicable.

Title 11 C.M.R. § 11.00 *et seq.*

condition triggering payment under the First Milestone.

Additionally, Debtors contend that the Notice of Project Change submitted by the BRA did not seek approval for the construction of office use space in Building 1 on Parcels 6 and 7. Debtors argue that, because the LDA permits INE to bring the research and office space combination contemplated for Building 1, Building 2 and Building 3 on Parcels 6 and 7 on line in such sequence as it determines, INE was entitled to devote Building 1 entirely to office use and the Notice of Project Change was deficient in its failure to obtain approval for such use for Building 1.

On October 31, 1990, the BRA submitted to the Secretary the required Notice of Project Change pursuant to the LDA. The Notice of Project Change, developed and drafted jointly by the BRA and INE, provided:

> First, as described in the Master Plan, it is proposed that Building 1 of the Research Center containing up to 330,000 square feet of usable space with structured parking be located on Parcel 7 ("Building 1"), a hotel/conference center containing up to 400 rooms with structured parking be located on Parcel 4 ("Hotel"), and a marina containing up to 150 marina slips, together with accessory marina uses and parking on Pier 9, ("Pier 9 Marina") be constructed by [INE] .... Second, it is proposed that the New England Aquarium Corporation ("NEAQ") construct and operate an aquarium ... on Parcel 5 .... Third it is proposed that INE develop Buildings 2 and 3 of the Biomedical Research Center containing up to 770,000 square feet of usable space with structured parking be constructed on Parcels 6 and 7 .... Development in the rest of the Navy Yard is expected to occur generally in conformity with the FEIR.

Ex. 6, Notice of Project Change.

On January 2, 1991, the Secretary issued a Certificate in response to the Notice of Project Change approving the hotel development on Parcel 4 and the medical research center in Building 1 on Parcel 7, subject to demonstration that the proposed changes were in compliance with Chapter 91 regulations[5] and the Boston Municipal Harbor Plan (the "Municipal Harbor Plan")[6] as described by the filing of so-called "Section 61 Findings" with the

---

**5.** Chapter 91 refers to Chapter 91 of the General Laws of Massachusetts which addresses development and management of the states waterways. *See* Mass.G.L. Ch. 91, § 1 *et seq.*

**6.** Title 301 C.M.R. § 9.02. The Municipal Harbor Plan is a plan developed and adopted by a municipality which, if approved, supersedes dimension and use restrictions imposed on waterfront properties by M.G.L. Ch. 91. *See* 301 C.M.R. § 23.00 *et seq.* and 310 C.M.R. § 9.00 *et seq.* Development of waterfront property requires securing of a license under M.G.L. Ch. 91.

The Municipal Harbor Plan is defined in the Code of Massachusetts Regulations Title 301 C.M.R. 9.02:

Municipal Harbor Plan means a document (in words, maps, illustrations, and other media of communication) setting forth, among other things: a community's objectives, standards, and policies for guiding public and private utilization of land and water bodies within a defined harbor or other waterway planning area; and an implementation program which specifies the legal and institutional arrangements, financial strategies, and other measures that will be taken to achieve the desired sequence, patterns, and characteristics of development and other human activities within the harbor area. Such plan shall take effect under 310 C.M.R. 9.00 only upon written approval by the Secretary, provided that said plan approval is issued in accordance with 301 C.M.R. 23.00 and any associated written guidelines of CZM [Coastal Zone Management].

301 C.M.R. § 9.02.

MEPA unit of the EOEA. *See* Ex. 9. Additionally, the January 2, 1991 Certificate required further study of the balance of development proposed for Parcels 6 and 7. *See id.*

The BRA is empowered by Massachusetts General Laws Chapter 30 to make Section 61 Findings certifying that any environmental impact of a proposed development has been studied and that all feasible measures have been taken to mitigate the environmental consequences of the development. *See* Trans. at 172:10–16. On August 21, 1991, the BRA's Environmental Review Officer delivered to EOEA the BRA's Chapter 61 Findings with respect to Building 1 proposed for Parcel 7 and the proposed hotel for Parcel 4. *See* Trans. at 171:23–172:16. On August 23, 1991, a letter from the EOEA (the "EOEA Letter") informed the BRA that the filing of the Section 61 Findings for the proposed development on Parcels 4 and 7 concluded the MEPA process established by the Secretary's letter of January 2, 1991. *See* Ex. 16, EOEA Letter. The EOEA Letter further provided that "unless the projects change ... no further MEPA review and no further documentation is required of these projects." *See id.*

The BRA argues that, by the EOEA Letter, the Notice of Project Change condition of the First Milestone was satisfied on August 23, 1991. The Notice of Project Change condition required that the BRA seek and obtain approval of certain elements of the proposed development from the EOEA such that no further review would be required. *See* Ex. 4. The BRA satisfied that requirement by filing the Notice of Change and the required Section 61 Findings. The EOEA responded favorably to these submissions and concluded that no further work or review would be necessary as to the proposed development of a hotel on Parcel B (Parcel 4) and the

proposed development of Building 1 on Parcel A (Parcels 6 and 7). *See id.* The submissions made by the BRA to the EOEA were made after close consultation with INE personnel. *See* Trans. at 171:13–17; 198:3–199:3; 453:12–456:17; Ex. 88.

Debtors argue that the Notice of Project Change was deficient because the BRA failed to obtain MEPA approval of residential use construction on Parcel 4. However, prior to 1997, INE never submitted plans for approval of residential use on Parcel 4. *See* Trans. at 198:3–199:3; 744:2–7. The Notice of Project Change, prepared jointly by the BRA and INE, only contemplated construction of a 400–room hotel on Parcel 4. *See* Trans. at 171:13–17; 198:3–199:3; 453:12–456:17; Ex. 88. INE's plans and drawings submitted for approval during the permitting process between 1990 and 1992 only addressed construction of a hotel on Parcel 4. *See* Trans. at 197:11–199:3; 453:12–456:17; Ex. 88. The Notice of Project Change was submitted in October 1990, several weeks before the LDA was finalized and executed in December 1990. It would have been a simple matter for INE to include the appropriate language in either the Notice of Project Change or the LDA to effect the approval INE claims to have sought by submission of the Notice of Project Change. However, the Notice of Project Change sought only the approval of a hotel on Parcel 4.

The LDA defined the Development Program for Parcel 4 to include provisions that, should the Aquarium opt not to relocate to Parcel 5, INE might "at its option" develop either a hotel or residential housing units. However, at the time the Notice of Project Change was drafted and submitted for consideration, none of the parties involved in the approval process knew that the Aquarium would opt not to relocate to the Navy Yard. *See* Trans. at

According to the record before me, the Aquarium did not voice its hesitation about the decision to relocate to the Navy Yard until November 1991 at the earliest. *See id.; see also* Ex. 66 (November 11, 1991 report in the *Boston Herald* newspaper that "the Aquarium is having second thoughts about its . . . move to [the Navy Yard]"). Moreover, while the Aquarium finally and formally canceled its plans to relocate to the Navy Yard in October 1992, INE did not begin to pursue the residential housing option until some time in 1995. *See* Ex. 4; Trans. at 663:2–11. Even at that point, the architectural firm hired to conduct the residential housing study, concluded that the construction of residential housing on Parcel 4 was not economically feasible absent certain tax and financial relief for INE. *See* Trans. at 739:6–741:19. A formal plan to construct residential housing on Parcel 4 was not submitted by INE until April 15, 1997, some five years after the Aquarium was de-designated as developer of Parcel 5 and more than two years after the full purchase price was due and owing under the LDA. *See* Trans. at 198:3–199:3; 497:4–16; 744:2–7; Ex. 79. It is difficult to imagine, based upon the record before me, how INE expected the BRA to follow any other course than that which it pursued: in a timely fashion, pursuant to the LDA and the Notice of Project Change, the BRA sought and gained the requisite approval of the only plan on the table, a plan developed in concert by the BRA and INE. *See* Trans. at 164:3–13; 416:11–24; 45:14–46:23.

Debtors also argue that the BRA failed to meet the First Milestone in part because the BRA neither sought nor received approval for the construction of office space on Parcels 6 and 7. The LDA provided that up to 500,000 square feet of office space might be constructed on Parcels 6 and 7 "at the [INE's] option". *See* Ex. 4.

However, the proposal submitted by the INE in conjunction with the Notice of Project Change provided exclusively for the development of 330,000 square feet of biomedical research use for Building 1 on Parcel 7. *See* Trans. at 196:10–198:2; 453:16–454:13; Ex. 8. Debtors argue that Schedule C attached to the Notice of Project Change demonstrates that the parties were aware of and contemplated INE's desire to develop office space in Buildings 2 and 3 on Parcels 6 and 7 and were therefore required to secure approval for such contemplated development. *See* Ex. 6 at Schedule C. However, the Notice of Project Change condition of the LDA requires that the BRA secure EOEA approval only as to Building 1 on Parcels 6 and 7 and makes no mention of Buildings 2 and 3. *See* Ex. 4. The Notice of Project Change describes Building 1 as a "*Research Center* containing up to 330,000 square feet of usable space." *See* Ex. 6 (Emphasis added). Schedule C to the Notice of Project Change contemplates further development for Parcels 6 and 7, including specifically Buildings 2 and 3 and provides

> Of the total 1,100,000 square feet of space in the *Medical Research Center (including Building 1),* at least 600,000 square feet will be designed and constructed for research center (with accessory office) use, and 500,000 square feet *may be used* for primary office use *or for* Research Center uses, or some combination of the two.

Ex. 6 at Schedule C (Emphasis added). In examining the language of Schedule C in the context of the LDA, I do not buy the interpretation Debtors ascribe to the language defining the possible proposed development of office use space on Parcels 6 and 7. Schedule C seems to consider Building 1 separate and apart from Buildings 2 and 3 and, in conjunction with the treat-

ment of Building 1 in other portions of the Notice of Project Change, it appears likely that the parties anticipated that Building 1 would be used as a medical research center and that the use for Buildings 2 and 3 was at best undetermined. *See id.*

More importantly, the Notice of Project Change condition of the First Milestone does not require that the BRA secure EOEA approval for Buildings 2 and 3. *See* Ex. 4. The Notice of Project Change condition makes no mention whatsoever of Buildings 2 and 3. *See id.* As to Parcel A (Parcels 6 and 7), the Notice of Project Change condition only requires that the BRA secure approval "with respect to Building 1 on Parcel A . . . ." *See id.* Regardless of what Debtors might believe Schedule C attached to the Notice of Project Change may have indicated about the BRA's understanding of the Development Program as it pertained to Buildings 1, 2, and 3 on Parcels 6 and 7, the BRA was only required by the LDA to secure approval for Building 1 and that is precisely what the BRA did according to the Notice of Project Change. If INE desired more, INE was in a position to insist and insure that greater approval was at least requested if not obtained from the EOEA.

Additionally, testimony from witnesses for both Debtors and the BRA indicated that it was unheard of in their nearly 60 collective years of experience in real estate development in Massachusetts for the EOEA to approve of alternate uses for the same parcel in a single submission. *See* Trans. at 415:21–24; 495:19–496:6. This testimony further supports the notion that the parties understood that a separate submission would be required to secure approval for alternate uses for Parcels 6 and 7 and Parcel 4. *See id.*

Debtors cite language in the relevant regulations that call for the submission of alternative development proposals as an indication that the EOEA would, in fact, consider more than one development proposal in a single submission. *See* 301 C.M.R. § 11.07(4). Massachusetts regulation 301 C.M.R. § 11.07(4) that defines the content of any proposed EIR provides:

Ordinarily, an EIR shall contain the following parts:

\*       \*       \*       \*       \*       \*

A description of each alternative *to the proposed project* and a discussion of the primary differences among alternatives, particularly as they may effect the environment. The Secretary may specify in the scope of alternatives to be addressed. In all EIRs, the alternative of not carrying out the project (the No Build alternative) shall be addressed to establish the future baseline conditions to which the effects of the project will be compared.

The alternatives shall be evaluated giving primary consideration to the proponent's and any participating agency's mission and all pertinent legislative mandates. Alternatives not carried forward because of their presumed inferiority must be identified and the reasons for their rejection described. All other alternatives shall be analyzed at a level of detail sufficient to allow a meaningful comparison of impacts.

301 C.M.R. § 11.07(4) (Emphasis added). However, while Debtors argue that the language of 301 C.M.R. § 11.07(4) clearly provides that alternative projects may be submitted for approval in a single submission, a more reasonable reading of the statute, particularly in light of testimony by both Debtors' real estate attorney and the BRA, is that the statute merely seeks submissions of alternative proposals as a means to evaluate the relative environmental impact of "the proposed project." *See id.* I do not read 301 C.M.R. § 11.07(4) to provide that any and all project proposals

that a developer or agency might consider and submit in a single EIR would then be on the table for the EOEA's consideration as to each projects ultimate viability. Therefore, the cited language does nothing to alter my determination that the BRA, in conjunction with INE, properly submitted a proposal to develop research use space on Parcel A.

Furthermore, plans were never developed, nor were drawings commissioned, nor architects hired to develop office space for Parcel A, further suggesting that INE never seriously contemplated developing office space on Parcel A. It is difficult to perceive how the BRA could have pursued a course other than that which it did pursue in seeking and securing approval from the EOEA for construction of medical research space for Building 1 on Parcels A.

Nor am I persuaded by Debtors' contention that the BRA misinterprets the "options" contemplated by the Development Program of the LDA allowing for development of either hotel or residential housing on Parcel 4 and research or office use on Parcels 6 and 7. Even adopting Debtors' definition of "option" to mean "choice" or "alternative" it seem clear that the choice or alternative made by Debtors, and advanced as the appropriate course of action in October 1990 and for sometime thereafter, was to construct a hotel on Parcel 4 and research facilities in Building 1 on Parcels 6 and 7. While these option provisions were likely designed to allow INE to exercise discretion as to the ultimate course of construction on these parcels, the BRA could only reasonably be expected to secure approval pursuant to the LDA and the Notice of Project Change for the plans submitted by INE in the form approved by both the BRA and INE. The facts support the BRA's contention that such a course was followed and the appropriate approvals were obtained.

■ The third condition of the First Milestone requires the amendment of certain federally-imposed design restrictions on new development at the Navy Yard which requires that new construction comport with the historical character of the Navy Yard. In order to satisfy this condition of the First Milestone, the Historic Design Guidelines were to be amended so as to permit the LDA's Development Program to be completed "on an as-of-right basis . . . [with] use, height and other dimensional restrictions [that would be] no more restrictive that the use, height and other dimensional restrictions set forth in the [applicable zoning ordinance]." *See* Ex. 4 at § 208A(f); Trans. at 397:14–398:16. The amendments to the Historic Design Guidelines were to be executed and approved "to the satisfaction of [INE]." *See* Ex. 4 at § 208A(f).

The applicable zoning ordinance imposes, among other conditions, limitations on the height of buildings in the Navy Yard, allowing a maximum height of 155 feet for the buildings proposed for Parcel 7 and a maximum height of 125 feet for buildings proposed for Parcel 6. However, the Historic Design Guidelines impose a maximum height restriction for buildings on Parcel 6 of 110 feet, fifteen feet lower than the applicable zoning ordinance. Similarly, the Historic Design Guidelines allows a maximum height of 155 feet for Building 2 and Building 3 on Parcel 7, but a maximum height of only 140 feet for Building 1. Finally, the Historic Design Guidelines impose a view corridor that is not imposed under the applicable zoning ordinance, thereby reducing the allowable density that might otherwise be developed on Parcels 6 and 7.

Debtors argue that the required amendment to the Historic Design Guidelines were not obtained so as to permit Debtors to pursue their Development Program on

an "as-of-right" basis because the amendments obtained include height restrictions and impose a view corridor on Parcels 6 and 7 that are inconsistent with the applicable zoning ordinances. Because the amendments to the Historic Design Guidelines are more restrictive than the applicable zoning ordinances, Debtors argue that the First Milestone was not satisfied.

The BRA counters that they worked in close concert with INE personnel to develop acceptable amendments to the Historic Design Guidelines. *See* Trans. at 471:1–472:16; 179:24–180:14; 448:5–453:20. By two letters both dated July 15, 1991 (the "Francis Letters"), four days before the proposed amendments were submitted to the Massachusetts Historical Commission (the "MHC") and the Advisory Council on Historic Preservation (the "ACHP"), CHI's President, David Francis, communicated "enthusiastic support" to the EOEA for the BRA's Master Plan for the Navy Yard including the proposed amendments to the Historic Design Guidelines. Ex. 86 and Ex. 87. For example, one of the Francis Letters states in relevant part:

> The document that is before the MEPA for review is the result of over a hundred public meetings that have occurred over the past four years. The [BRA] has worked closely with the community . . . to achieve a plan that would balance the many complex issues and interests before them, such as open space, *historic concerns,* facilities of public accommodation, traffic, parking, waterfront uses and public access.

Ex. 87 (Emphasis added). On July 19, 1991, all necessary parties executed the amendment to the Historic Design Guidelines. *See* Trans. at 180:4–181:5. The BRA contends that the amendments, as executed, satisfy the amendment to the Historic Design Guidelines condition of the

First Milestone "to the satisfaction of [INE]." *See* Ex. 4 at § 208A(f).

Debtors argue that on both February 15, 1991 and April 9, 1991, INE alerted the BRA to INE's dissatisfaction with the proposed amendments to the Historic Design Guidelines. *See* Ex. 57; Ex. 58; Trans. at 402:18–24; 403:1–24; 404:1–10. Further, Debtors argue that the amendments to the Historic Design Guidelines as adopted on July 19, 1991 differed from the version of proposed amendments that INE had seen most recently prior to adoption. *See* Trans. at 502:5–15. Debtors also argue that INE did not learn of the adoption of the amended Historic Design Guidelines until approximately ten to twelve days after they were adopted. *See* Trans. at 502:5–15.

However, the record is devoid of any evidence that, after April 9, 1991, any problems that INE had with the amended Historic Design Guidelines were ever expressed in writing to the BRA, either before or after adoption of the amended Historic Design Guidelines. *See* Trans. at 502:21–23. Although sometime after the July 19, 1991 adoption of the amended Historic Design Guidelines an officer at INE apparently raised INE's concerns with the amended Historic Design Guidelines in a conversation with an official at the BRA, these concerns apparently were never directly and explicitly committed to writing for consideration by the BRA between April 9, 1991 and submission and adoption of the Notice of Project Change. *See id.*

As to INE's pre-adoption notices to the BRA that INE might have concerns about the proposed Historic Design Guidelines, the February 15, 1991 letter to the BRA merely indicates that INE, five months before adoption of the relevant amendments, was not amenable to the existing height and density restrictions imposed by

the Historic Design Guidelines and wished to be included in any discussions with respect to modifications of the guidelines. *See* Ex. 57. Similarly, INE's April 9, 1991 letter to the BRA merely suggests changes to the Historic Design Guidelines. *See* Ex. 58. Neither of these letters demonstrates that, by the time the BRA submitted what was to become the final amended Historic Design Guidelines, INE was not on board with the proposed changes. *See* Ex. 57 and 58. In fact the only evidence before me, absent the testimony on an INE official that he expressed dissatisfaction to the BRA after the July 19, 1991 adoption of the amendments to the guidelines, are two letters from a CHI officer to the EOEA expressing CHI's "enthusiastic support" for the proposed plan. *See* Ex. 86 and 87. Had there been a genuine dispute as to whether the amendments to the Historic Design Guidelines satisfied the relevant condition under the First Milestone, INE should have done more than simply voice its displeasure with the Historic Design Guidelines in a post-adoption conversation. I assign little weight to Debtors' argument that they have consistently maintained that the amendments as adopted did not satisfy the conditions imposed by the First Milestone given that Debtors failed to voice their concerns in a tangible and credible manner for more than six years. Nor is there any evidence before me to suggest the manner in which the amended Historic Design Guidelines differed from those that received Debtors' "enthusiastic support" just prior to the amendment.

Debtors also assert that on several occasions after July 19, 1991, INE alerted the BRA to the possibility that the First Milestone had not been satisfied. *See* Ex. 65; Ex. 68; Ex. 70. By a letter of September 4, 1991, CHI indicated that they were still "analyzing the status of ... [the BRA's] efforts to achieve the First Milestone."

Ex. 65. An April 24, 1992 letter from INE to the BRA provides that

> written communications and oral discussions between representatives of [INE] and the [BRA] regarding potential restructuring of the existing [LDA] will be privileged settlement discussions arising out of *potential* disputes as to whether a default exists under the existing [LDA].

Ex. 68 (Emphasis added). Finally, on September 15, 1992, in response to a demand by the BRA upon INE for payments the BRA believed were then due and owing under the LDA for accomplishment of the First Milestone, an officer at INE stated that "INE does not necessarily agree that the sums demanded are due and owing under the LDA." Ex. 70.

None of these post-adoption letters explicitly and concretely evidence Debtors' dissatisfaction with any particular element of the BRA's efforts to satisfy the conditions of the First Milestone, particularly the adopted amendments to the Historic Design Guidelines. At most, the letters suggest a general belief that the First Milestone might not have been met; the letters can also be read as an attempt by Debtors to preserve any rights they might assert in *potential* disputes with the BRA and a hope that any discussions surrounding efforts to further amend the LDA might remain confidential. As such, I cannot take any of these letters on their face as evidence that Debtors raised meaningful objections to the amended Historic Design Guidelines such that the BRA would have been on sufficient notice of INE's concerns or would have had a meaningful opportunity to timely address Debtors' unarticulated concerns. Debtors worked in close contact with BRA to submit acceptable amendments to the Historic Design Guidelines. *See* Trans. at 471:1–472:16; 179:24–180:14. Debtors expressed "enthusiastic support" for the amendments thus

submitted. *See* Ex. 86 and 87. The amended Historic Design Guidelines were accepted by the MHC and the ACHP and the amended guidelines were signed by all parties. *See* Trans. at 180:4–181:5. Not until the Plan Administrator filed the present motion was there any written, concrete suggestion that Debtors believed that the BRA had failed to meet this condition of the First Milestone. As such, I find that, at all relevant times the BRA had satisfied the Historic Design Guidelines condition of the First Milestone.

By a clear preponderance of the evidence I find that the BRA satisfied the two elements of the First Milestone whose completion is challenged here by INE. Consequently, I find that pursuant to LDA Art. II, § 203(a) any and all sums owing upon completion of the First Milestone must be remitted to the BRA pursuant to § 365 of the Bankruptcy Code on account of Debtors' assumption and assignment of the LDA.

■ Satisfaction of the Second Milestone required the BRA to obtain, from the Secretary of the EOEA, a certificate (the "Certificate") as to Parcels A, B, C, D, and E approving the Final Environmental Impact Report (the "FEIR") for *"all portions of the Development Program* without requiring further notice or study under the MEPA". *See* Ex. 4 at § 101(62) (Emphasis added). Pursuant to the LDA and in regard to Parcel E only, the Secretary's Certificate was also required to provide modification of any Design Restrictions in accordance with the provisions of § 208A(f) of the LDA, if such modification had not previously been obtained, to permit INE's Development Program on an as-of-right basis. *See id.* at § 101(63).

The BRA contends that the final step in the MEPA approval process was satisfied when, on August 31, 1992, the EOEA issued a Certificate on the FEIR as submit-ted by the BRA in consultation with INE. *See* Trans. at 194:8–195:16; 50:16–52:7; Ex. 29. In the Certificate approving the FEIR, the Secretary determined that the FEIR submitted on the proposed development of Buildings 2 and 3 on Parcels 6 and 7 "adequately and properly complies with the [MEPA] . . . ." *See* Ex. 29. With approval of development for the 400–room hotel, a 150–slip marina, and 1,100,000 square feet of medical research space, only approval for development of Parcel C (Pier 5, the proposed Aquarium location) was not provided by the Certificate. However, the Letter Agreement between the parties covered this contingency, providing that "notwithstanding the requirements of the LDA, if the only failure to achieve either the First or Second Milestone was due to Pier 5 related issues, then all payments arising out of the First and Second Milestone would be due nevertheless." *See* Ex. 5. Thus, the BRA argues that by August 31, 1992, it had achieved both the First and Second Milestones and INE became liable for all payments due on Parcel A under the LDA.

Debtors argue that the Certificate issued by the Secretary on August 31, 1992 did not meet the standard set forth in §§ 101(62) and (63) of the LDA. The Certificate approved construction of additional biomedical research space for Buildings 2 and 3 on Parcels 6 and 7 but did not approve development of office space use on Parcels 6 and 7 as contemplated by the LDA and desired by INE. Additionally, the Certificate required that construction of the requisite public use facilities contemplated for the Yard's End be completed before INE was to be allowed to complete construction of the proposed biomedical research facilities on Parcels 6 and 7. Debtors argue that this construction phasing requirement is inconsistent with the Development Program's provi-

sion for Parcel A that provides that "the components [of Parcels 6 and 7 development] may be brought on line in such sequence as [INE] determines." *See* Ex. 4 at Exhibit B.

Finally, Debtors argue that the Second Milestone was not met because the Secretary's Certificate provided that a proposed alternate public use plan (the "Whydah Plan"), created to fill the void left when the Aquarium opted not to relocate to Parcel 5, required amendment to the Municipal Harbor Plan before the Massachusetts Department of Environmental Protections (the "DEP") would issue a Chapter 91 license to the INE for Buildings 2 and 3 on Parcels 6 and 7. To date, the BRA has not amended the Municipal Harbor Plan which expired in the Fall of 1997. The LDA requires that the BRA use its "best efforts" to cause the renewal of the Municipal Harbor Plan. *See* Ex. 4 at § 208A(e).

The BRA counters that the so-called phasing restriction imposed by the Certificate has no practical effect on the Development Program such that the Second Milestone would not be met because INE contemplated a two-phase development by which the hotel on Parcel 4, Building 1 on Parcels 6 and 7, and the marina on Parcel D were to be completed before INE commenced the second phase of the Development Program during which Buildings 2 and 3 on Parcels 6 and 7 were to be completed. *See* Trans. at 169:13–170:4; 419:14–420:24. Thus, the phasing restriction imposed no greater limitations on the Development Program than those contemplated by INE. *See* Ex. 6. Further, the BRA argues that, even absent the relocation of the Aquarium, the proposed development of the hotel on Parcel 4 and other proposed dedication of square footage to "facilities of public accommodation" contemplated for Parcel E by the LDA would

have satisfied the public use requirements at Yard's End such that INE's Development Program might have progressed as INE envisioned.

Although the BRA is correct that the Secretary determined that the FEIR "adequately and properly complies with the [MEPA] . . . ," I find that the Certificate is deficient such that the BRA's obligation to satisfy the Second Milestone has not been met. *See* Ex. 29. Primarily, the failure to secure the Secretary's approval for office use development on Parcels 6 and 7 constitutes a deficiency given that the terms of the LDA and communications between the INE and the BRA during the approval process made it clear that INE sought approval for the total Development Program. *See* Ex. 4; Ex. 62; Ex. 63. As to Parcels 6 and 7, the LDA explicitly provides INE the option of building up to 500,000 square feet of office use space out of the total 1,100,000 square feet to be developed on these parcels. *See* Ex. 4 at Exhibit B. Further, a June 6, 1991 letter (the "Smith–Barrett Letter") from INE to the BRA provided:

> According to the . . . LDA, the Biomedical buildings can be used as office space in the event Biomedical tenants can not [sic] be located. In order to avoid the need to file a [Notice of Project Change] with MEPA, if that need should develop, we would like to suggest the inclusion of such language in the [Draft Supplemental Environmental Impact Report], and that the traffic, water, sewer and other analysis reflect the possibility of office use.

Ex. 62, Smith–Barrett Letter. Additionally, a June 21, 1991 letter (the "Francis–Coyle Letter") from INE to the BRA provided:

> as you know, the "Development Program" described in the LDA, as well as the zoning applicable to parcels 6 and 7

... permits up to 500,000 square feet of the total 1,100,000 square feet to be constructed and used for office use (as well as for research).

Ex. 63, Francis–Coyle Letter. Although the Francis–Coyle Letter noted that INE did not wish to impede the progress of obtaining MEPA approval of the Yard's End Development Program by objecting to the proposed DSEIR in the immediate term, the Francis–Coyle Letter was clear that:

> By not objecting to the filing of the DSEIR on this basis, INE Does not waive its rights under the LDA to insist that the full "Development Program" (including office use) has the benefit of full MEPA sign off before the Second Milestone under the LDA is deemed to have been achieved.

*See id.*

Thus, unlike the circumstances surrounding its efforts to achieve the First Milestone, the record reflects that the BRA was on sufficient notice at all relevant times that successful completion of the Second Milestone was contingent on approval of the full Development Program, including office use for Parcels 6 and 7. *See id.; see also* Ex. 4; Ex. 62. However, the Certificate did not approve office use for Parcels 6 and 7 and thus did not constitute approval for all portions of the Development Program pursuant to the LDA. *See* Ex. 29; Ex. 4.

Additionally, the Secretary's construction phasing requirement by which the completion of any development proposed for Parcels 6 and 7 must be delayed until the completion of the public use facility on Parcel 5 is inconsistent with the Development Program's provision for Parcel A which provides that "the components of [Parcels 6 and 7 development] may be brought on line in such sequence as [INE] determines." Ex. 4 at Exhibit B. Failure

to approve development of office use space on Parcels 6 and 7 effectively precluded INE from bringing these projects on line as it determined because it could not build office space at all.

Further, the Secretary's prohibition of INE's completion of development on Parcels 6 and 7 prior to completion of the public use facility on Parcel 5 became first problematic and ultimately fatal to the BRA's efforts to meet the Second Milestone when (i) the Aquarium opted not to relocate to Yard's End in 1992 and (ii) the subsequent public use project, the Whydah Project, also failed to materialize. Without a public use project in place for Parcel 5, it was impossible for a public use project to be completed prior to completion of INE's proposed development on Parcels 6 and 7 according to the Secretary's phasing requirement, even if INE opted simply to develop research facilities.

Finally, because the Aquarium opted not to relocate to the Navy Yard, the Certificate requires an amendment to the Municipal Harbor Plan before the DEP would issue a Chapter 91 license to INE for Buildings 2 and 3 on Parcels 6 and 7. *See* Ex. 29. Pursuant to the LDA, the BRA is required to use best efforts to cause approval of the Municipal Harbor Plan as submitted in October 1990, renewal of such Municipal Harbor Plan without change, or reinstatement of a revoked Harbor Plan in essentially the same form as that originally submitted. *See* Ex. 4 at § 208A(e). To date, the BRA has not amended the Municipal Harbor Plan. *See* Trans. 385:7–386:6. Because of the construction phasing restriction imposed by the Certificate, absent amendment to the Municipal Harbor Plan, development at Yard's End cannot go forward under the LDA. It is not enough to satisfy the BRA's contractual obligation that, as the BRA argues, if INE had developed the hotel and other "facili-

ties of public accommodation" the public use requirements at Yard's End would have been met. The construction phasing restriction simply imposed restraints on INE that were not part of its bargain under the Second Milestone.

## CONCLUSION

For the reasons stated above, the Plan Administrator's Motion seeking an order determining that the cure amount owed to the BRA is "zero" will be denied in part and granted in part: I find that payment is owed to the BRA for satisfaction of the First Milestone but I find that payment is not owed the BRA because of its failure to satisfy the Second Milestone. Pursuant to the assumption and assignment of the LDA, Debtors are obligated to immediately pay as cure amounts the obligations triggered by BRA's satisfaction of the First Milestone. Since BRA has not satisfied the Second Milestone, the obligations arising therefrom are not due as cure amounts at this time.

The BRA should submit an order on notice.